# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

# IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Cr. ID. No. 1207000397 A & B |
| | ) | |
| | ) | |
| JERMAINE L. WATSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Submitted: June 2, 2015
Decided: September 9, 2015

# COMMISSIONER'S REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF SHOULD BE DENIED.

Matthew B. Frawley, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State.

Patrick J. Collins, Esquire and Albert J. Roop, V, Esquire, 716 North Tatnall Street, Suite 300, Wilmington, Delaware, Attorneys for Defendant Jermaine Watson.

PARKER, Commissioner

This 9th day of September, 2015, upon consideration of Defendant's Motion for Postconviction Relief, it appears to the Court that:

**BACKGROUND AND PROCEDURAL HISTORY**

1.      On July 6, 2012, Defendant Jermaine Watson was arrested for an incident that occurred on June 25, 2012.   Defendant was subsequently indicted on a number of charges.

2.      On January 31, 2013, a Superior Court jury found Defendant guilty of Robbery First Degree (as to Jerome Ames), two counts of Possession of a Firearm during the Commission of a Felony (as to Jerome Ames), and Assault Second Degree (as a lesser included offense of Assault First Degree) (as to Jerome Ames).   The jury found Defendant not guilty of Aggravated Menacing and its companion Possession of a Firearm during the Commission of a Felony (as to Crystal Stewart).

3.      During a simultaneous bench trial on the severed count of Possession of a Firearm by a Person Prohibited, the Superior Court judge found Defendant guilty.

4.      On April 12, 2013, Defendant was sentenced to a total of 20 years of unsuspended Level V time, followed by decreasing levels of probation.

5.      Defendant filed a direct appeal to the Delaware Supreme Court. On October 21, 2013, the Delaware Supreme Court affirmed the judgment of the Superior Court.[1]

**FACTS**

6.      The facts giving rise to the subject charges, as mainly set forth by the Delaware Supreme Court in its opinion on Defendant's direct appeal, are as follows:  The evidence presented at trial established that, on June 25, 2012, at approximately 3:00 p.m., the male victim (Jerome Ames) was sitting with his female cousin (Crystal Stewart) on the steps of

---

[1] *Watson v. State,*  2013 WL 5745708 (Del.).

1

the residence at 1023 Bennett Street, Wilmington, Delaware. An African-American man with who neither was familiar walked past them. From about five feet away, the man turned around, pulled out a revolver with his left hand, pointed it at the male victim and demanded money. The victim took his money from his left pocket and gave it to the robber. The victim then grabbed for the robber's left wrist and the two struggled over the gun. During the struggle, the gun fired, hitting the victim above his left knee. The robber ran away and the victim's cousin called 911.[2]

7.      The Affidavit of Probable Cause stated that after the victim was shot the assailant "walked" southbound on Bennett Street out of sight.[3] At trial, the victim, Jerome Ames, testified that after he was shot the assailant "walked up the street, ran up the street, like a little jog up the street."[4]

8.      The victim was taken to the Christiana Hospital Emergency Room. While in the Emergency Room, the victim told a Wilmington police detective that the robber was a thin, medium-skinned African-American male, 5 foot 7 or 8, with a short Afro and wearing tan khaki shorts. The victim's cousin gave a description of the robber to police and stated that she could identify the man if she saw him again. Neither the victim nor his cousin had known the Defendant prior to the robbery.[5]

9.      On June 29, 2012, four days after the robbery, both the victim and his cousin identified Defendant as the robber after being shown a photographic line-up. The victim

---

[2] *Watson v. State,* 2013 WL 5745708, at *1 (Del.); January 29, 2013 Trial Transcript, at pgs. 32-43..
[3] Superior Court Docket No. 47-Appendix to Defendant's Amended Rule 61 Motion, at pg. 14.
[4] January 29, 2013 Trial Transcript, at pg. 43.
[5] *Watson v. State,* 2013 WL 5745708, at *2 (Del.).

and his cousin were separate and apart from each other at the time each were shown the photographic line-up and each of them identified the Defendant as the robber.[6]

10. At trial, both the victim and his cousin testified, but reluctantly. The trial had originally been scheduled to begin on January 15, 2013, but was continued at the State's request when the victim failed to appear for trial.[7] A material witness warrant was issued for the victim and the trial was rescheduled for January 29, 2013.[8]

11. On January 29, 2013, at trial, the victim's presence was secured by means of a material witness warrant. Prior to trial, the victim told the prosecutor that he had been intimidated.[9]

12. The victim's cousin appeared for trial with a face covering, which the judge subsequently ordered her to remove. She told the prosecutor that she did not want the defendant to see her face.[10]

13. Neither the victim nor his cousin identified Defendant as the robber at trial. However, the police witnesses testified that the victim and his cousin had previously given statements describing the robber and had identified Defendant as the robber in the photographic line-up.[11]

14. Based upon that evidence, the jury found Defendant guilty of robbery, assault and two weapon charges and found him not guilty of aggravated menacing and the associated weapons charge. The charge of weapon possession by a person prohibited was severed

---

[6] *Watson v. State,* 2013 WL 5745708, at *2 (Del.).
[7] See, Superior Court Docket No. 20.
[8] Superior Court Docket No. 13; January 29, 2013 Trial Transcript, at pgs. 3-4.
[9] *Watson v. State,* 2013 WL 5745708, at *2 (Del.).
[10] *Watson v. State,* 2013 WL 5745708, at *2 (Del.).
[11] *Watson v. State,* 2013 WL 5745708, at *2 (Del.).

3

and, in a separate proceeding, the Superior Court judge found Defendant guilty of that charge.[12]

15.    On direct appeal, Defendant claimed, *inter alia,* that there was insufficient evidence introduced by the State to support his convictions.  The Delaware Supreme Court held that Defendant's claims raised on appeal were without merit and further concluded that, under the circumstances of this case, the record reflected that the State introduced more than sufficient evidence to support Defendant's convictions.[13]

## DEFENDANT'S RULE 61 MOTION

16.    On May 8, 2014, Defendant filed a *pro se* motion for postconviction relief.[14] Thereafter, Defendant was assigned counsel and an Amended Motion for Postconviction Relief was filed on February 27, 2015.  In the subject motion, as amended by Rule 61 counsel, Defendant claims that trial counsel was ineffective for failing to investigate, and as a result, failed to present alibi witnesses or evidence that Defendant had previously been shot and was physically unable to commit the robbery at issue.

17.    Before making a recommendation, the Commissioner enlarged the record by directing Defendant's trial counsel to submit an Affidavit responding to Defendant's ineffective assistance of counsel claim.  Thereafter, the State filed a response to the motion.  Defendant filed a reply thereto.[15]

18.    In order to prevail on an ineffective assistance of counsel claim, Defendant must meet the two-pronged *Strickland* test by showing that:  (1) counsel performed at a level "below an objective standard of reasonableness" and that, (2) the deficient performance

---

[12] *Watson v. State,* 2013 WL 5745708, at *2 (Del.).
[13] *Watson v. State,* 2013 WL 5745708, at *2-3 (Del.).
[14] See, Superior Court Docket No. 32.
[15] Super.Ct.Crim.R. 61(g)(1) and (2).

prejudiced the defense.[16] The first prong requires the defendant to show by a preponderance of the evidence that defense counsel was not reasonably competent, while the second prong requires him to show that there is a reasonable probability that, but for defense counsel's unprofessional errors, the outcome of the proceedings would have been different.[17] When a court examines a claim of ineffective assistance of counsel, it may address either prong first; where one prong is not met, the claim may be rejected without contemplating the other prong.[18]

19.     Mere allegations of ineffectiveness will not suffice; instead, a defendant must make and substantiate concrete allegations of actual prejudice.[19] Although not insurmountable, the *Strickland* standard is highly demanding and leads to a strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance.[20] Moreover, there is a strong presumption that defense counsel's conduct constituted sound trial strategy.[21]

20.     In considering post-trial attacks on counsel, *Strickland* cautions that trial counsel's performance should be reviewed from the defense counsel's perspective at the time decisions were being made. It is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.[22] A fair assessment of attorney performance requires that

---

[16] *Strickland v. Washington,* 466 U.S. 668, 687-88, 694 (1984).
[17] *Id.*
[18] *Strickland,* 466 U.S. at 697.
[19] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).
[20] *Albury v. State*, 551 A.2d 53, 59 (Del. 1988); *Salih v. State*, 2008 WL 4762323, at *1 (Del. 2008).
[21] *Strickland v. Washington,* 466 U.S. 668, 689 (1984).
[22] *Strickland,* 466 U.S. at 688-89.

every effort be made to eliminate the distorting effects of hindsight. Second guessing or "Monday morning quarterbacking" should be avoided.[23]

21.    The United States Supreme Court recently reiterated the high bar that must be surmounted in establishing an ineffective assistance of counsel claim. In *Harrington v. Richter,*[24] the United States Supreme Court explained that representation is constitutionally ineffective only if it so undermined the proper functioning of the adversarial process that the defendant was denied a fair trial.[25] The challenger's burden on an ineffective assistance of counsel claim is to show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial.[26]

22.    The United States Supreme Court reasoned that it is difficult to establish an ineffective assistance claim when counsel's overall performance indicates active and capable advocacy.[27] Counsel's representation must be judged by the most deferential of standards. The United States Supreme Court cautioned that reviewing courts must be mindful of the fact that unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with his client, with opposing counsel, and with the judge.[28]

---

[23] *Id.* at 688-89.
[24] *Harrington v. Richter,* 131 S.Ct. 770 (2011).
[25] *Id.,* at * 791.
[26] *Id.*
[27] *Id.* at 791.
[28] *Id.* at 787-88.

6

23.	Turning now to the subject case, when reviewing the entire proceeding, the record reflects counsel's overall performance as being active, thorough and capable advocacy. The record reflects that defense counsel consistently and diligently defended the charges against Defendant. Indeed, at trial, Defendant was found not guilty of the charges related to the eyewitness, Crystal Stewart, of Aggravated Menacing and its companion Possession of a Firearm during the Commission of a Felony.

24.	With these standards as the backdrop, we turn to Defendant's claim.

25.	Defendant's medical records reveal that on April 16, 2012, 10 weeks before the subject incident of June 25, 2012, Defendant had suffered gunshot wounds to his left upper extremity, right buttock and left flank. He was hospitalized on April 16, 2012 and discharged on April 25, 2012.[29]  Defendant was fitted with a colostomy bag as a result of his gunshot wounds.

26.	On June 21, 2012, Defendant went to the Emergency Room at Wilmington Hospital complaining of abdominal pain and pain at the colostomy site. He was treated and released that day. [30]

27.	On July 6, 2012, 11 days after the incident at issue, Defendant was arrested. Following his arrest, he was evaluated at the infirmary at Howard R. Young Correctional Institute. The intake records note that Defendant's colostomy bag was not properly attached. He was counseled, provided supplies and approved for and released to the general prison population.[31]  There is no indication in the medical records that Defendant's physical condition required any daily assistance from any caretaker or aide while in prison.

---

[29] Superior Court Docket No. 47- Appendix to Defendant's Amended Rule 61 Motion, at pgs.  A220-A242.
[30] Superior Court Docket No. 47- Appendix to Defendant's Amended Rule 61 Motion, at pgs.  A220-A242.
[31] Appendix to Defendant's Rule 61 motion, at pgs. A240-A242.

7

28.    Defendant, in his amended Rule 61 motion, contends that his trial counsel was ineffective for failing to investigate and present exculpatory evidence as to his physical condition on the date of the robbery.  Specifically, Defendant contends that had counsel conducted a proper investigation, he would have secured the appearance of Defendant's then 17 year old sister, Sharnagia Watson, at trial.  Defendant's Rule 61 counsel provided an Affidavit from Ms. Watson that stated that she was helping Defendant recuperate from gunshot wounds, that he had a colostomy bag, walked with difficulty and could not feed or bathe himself, and required fulltime care.  In her Affidavit, she further stated that had she been contacted by counsel, she would have testified as to Defendant's condition at the time of the offense.  She would have testified that Defendant could "hardly walk" or care for himself and could not possibly have struggled with someone or ran away from an incident.[32]

29.    In response to Defendant's claim that trial counsel failed to properly investigate and present exculpatory evidence as to Defendant's physical condition on the date of the robbery, Defendant's trial counsel provided a detailed Affidavit, with supporting documents and exhibits.[33]

30.    In his Affidavit, Defendant's trial counsel explains that although he was aware that Defendant had suffered gunshot wounds 10 weeks prior to the incident at issue, Defendant never advised him that he had any medical condition that impaired his physical abilities.  At no point during the pendency of the case did Defendant suggest that he was incapable of committing the offense due to being shot.[34]

---

[32] Superior Court Docket No. 47- Appendix to Defendant's Amended Rule 61 Motion, at pgs.  A243-A244.
[33] See, Affidavit of Timothy J. Weiler, Superior Court Docket No. 49.
[34] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49.

31. During the pendency of the case, as Defendant's trial counsel was conducting his pre-trial investigation, Defendant remained adamant in his belief that the victim and witness would not appear for trial and Defendant would not consider any plea offer because he did not believe that the trial would be going forward.[35] Indeed, the trial was originally scheduled to begin on January 15, 2013, but was continued at the State's request when the victim failed to appear for trial.[36] A material witness warrant was issued for the victim and the trial was rescheduled for January 29, 2013.[37]

32. At trial, both the victim and his cousin testified, but reluctantly.[38] The victim's cousin appeared for trial with a face covering, which the judge subsequently ordered her to remove. She told the prosecutor that she did not want the defendant to see her face.[39] Neither the victim nor his counsel identified Defendant as the robber at trial.

33. Defendant's trial counsel explains that during the initial intake interview, on July 10, 2012, the Public Defender's office became aware that:

* Defendant had been shot three months earlier but Defendant advised that he had only mental health issues and seizures as a result thereof;

* Defendant was living with his Aunt, Mere Dollard, at 226 North Clayton Street, Wilmington, Delaware 19805 and if released, he would be returning and residing at that address;[40] and

* Defendant did not know of any witnesses who could assist the defense in the trial.[41]

---

[35] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 16.
[36] See, Superior Court Docket No. 20.
[37] Superior Court Docket No. 13; January 29, 2013 Trial Transcript, at pgs. 3-4.
[38] *Watson v. State,* 2013 WL 5745708, at *2 (Del.).
[39] *Watson v. State,* 2013 WL 5745708, at *2 (Del.).
[40] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 1.
[41] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 1.

34.     During the initial intake interview on July 10, 2012, Defendant did not advise that he had any medical conditions that impaired his physical abilities.[42]

35.     On August 9, 2012, Defendant's trial counsel conducted a videophone interview with Defendant.  Defendant never mentioned to trial counsel that he had any alibi witnesses nor did he ever mention that that he had any medical condition that impaired his physical abilities.[43]

36.     On September 19, 2012, Defendant's trial counsel conducted another videophone interview with Defendant.  Defendant advised counsel that he was at home recuperating from gunshot wounds at the time of the incident and that his Aunt Gia Mayo would provide an alibi.  Defendant provided the telephone number for Aunt Gia Mayo.[44]

37.     Following the videophone interview, Defendant's trial counsel instructed Special Investigator James Lane to contact Gia Mayo.[45]

38.     Special Investigator James Lane spoke to Defendant on September 28, 2012 to obtain additional witness contact information.  Defendant directed Mr. Lane to call Defendant's father, Jermane Dollard, to get the additional witness contact information.[46]

39.     On October 1, 2012, Special Investigator James Lane spoke with Gia Mayo.  She would not provide any information and expressed reluctance about testifying in court.[47]

40.     On October 1, 2012, Defendant's trial counsel wrote Defendant a letter advising him that Gia Mayo was refusing to be of any assistance and would not testify as an alibi witness.[48]

---

[42] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49.
[43] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 2.
[44] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 3.
[45] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 3.
[46] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 4.
[47] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 5.
[48] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 6.

41. On November 7, 2012, Defendant's trial counsel met personally with Defendant at the Howard R. Young Correctional Institute. During the meeting, Defendant never mentioned any physical problems he was experiencing on the date of the incident. Defendant did advise counsel of alibi witnesses: Gia Mayo (Defendant's aunt), Jermaine Clark (Defendant's brother age 22) and Sharnagia Watson (Defendant's sister age 17). Defendant provided telephone numbers to contact these witnesses.[49]

42. On that same day, November 7, 2012, Defendant's trial counsel asked Special Investigator Lane to investigate Defendant's three alibi witnesses.[50]

43. One of the exhibits attached to Defendant's trial counsel's Affidavit was the e-mail he sent to Special Investigator Lane on November 7, 2012, in which trial counsel requested that Mr. Lane again contact Defendant's aunt, Gia Mayo.[51] Defendant's trial counsel also requested that Mr. Lane contact Jermaine Clark, Defendant's brother, and Sharnagia Watson, Defendant's sister, to determine if they could support an alibi defense. Defendant's trial counsel provided the special investigator with the telephone number given to him by Defendant for Sharnagia Watson.[52]

44. On November 8, 2012, Mr. Lane called the telephone number that Defendant provided for Sharnagia Watson and left a voice mail message requesting that she call him back.[53]

45. On November 11, 2012, Mr. Lane called Sharnagia Watson again at the telephone number provided by Defendant. A female answered the telephone and told him that he had the wrong number.[54]

---

[49] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 7.
[50] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 7; Exhibit D to counsel's Affidavit.
[51] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, Exhibit D.
[52] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, Exhibit D.
[53] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 9.

46. On November 11, 2012, Mr. Lane called Defendant's father, Jermane Dollard, and left a voice mail requesting his assistance in locating the witnesses.[55]

47. On November 14, 2012, Mr. Lane advised Defendant's trial counsel that Gia Mayo was refusing to be of any assistance.[56] Mr. Lane further advised that he "spoke to a female on 11-11 at the number for Sharnaigh (sic) and she informed me that the subject, Sharnaigh, did not live there and she had no knowledge of the case." Mr. Lane continued: "I also tried to get in touch with a subject, Jamine Dollar (sic), who had identified himself as our client's father in a previous conversation. I left a message on the answering machine . . . on 11-11 asking the subject to return my call to assist in locating the witness. I tried the number again on 11-14 and found it was out of service. At this point I do not have any other options. I think we have made a strong effort in locating the alleged witnesses in this case."[57]

48. On November 14, 2012, Defendant's trial counsel wrote a letter to Defendant enclosing the e-mail between trial counsel and Special Investigator Lane and advising: "Our special investigator, Mr. Lane, attempted to re-initiate contact with your alibi witness, your aunt, Gia Mayo, and was unsuccessful; likewise with your other alibi witness . . ."[58]

49. On January 3, 2013, Defendant's trial counsel had another videophone meeting with Defendant and advised of the lack of contact with Gia Mayo. Defendant told counsel that Gia Mayo was "out running the streets on drugs."[59]

---

[54] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 10.
[55] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 10.
[56] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, Exhibit D.
[57] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, Exhibit D.
[58] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 13; Exhibit E to counsel's Affidavit.
[59] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 14.

12

50. On January 15, 2013, Mr. Lane went to 226 North Clayton Street, Wilmington, Delaware. This was the address that Defendant provided to counsel as the residence where he was residing. Defendant had also advised counsel that he was living with his aunt, Mere Dollard, at this address and that if released, he would be returning to this address to reside.[60]

51. On January 15, 2013, Mr. Lane spoke to Defendant's aunt, Amira, at this address. She told Mr. Lane that she would contact the witnesses he was trying to reach and have them contact him.[61]

52. On January 29, 2013, the first day of trial, counsel spoke with Defendant's family members and they were aware that counsel was trying to locate witnesses.[62]

53. On January 29, 2013, prior to the start of trial, Defendant's trial counsel advised the court that counsel was trying to contact alibi witnesses but was not successful in doing so. Counsel reserved the right to call the three alibi witnesses in the hopes that their appearance could be secured for trial.[63]

54. Defendant's father was in the courtroom during the entire trial. Defendant's father called Jermaine Clark, Defendant's brother, and told him to come in and testify for his brother.[64]

55. On January 29, 2013, Defendant's trial counsel spoke with Jermaine Clark, Defendant's brother. Although Defendant had advised trial counsel that his brother would be an alibi witness, when counsel spoke to Jermaine Clark he learned that Mr.

---

[60] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶¶ 1, 15.
[61] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 15.
[62] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, at ¶ 17.
[63] January 29, 2013 Trial Transcript, Jury Selection, at pg. 11.
[64] January 30, 2013 Trial Transcript, at pgs. 139-141.

Clark was not with his brother on the day of the incident. Mr. Clark was with the Defendant 11 days later, on the day he was arrested.[65]

56. Jermaine Clark testified at trial that his brother was right-handed. He also testified that he never saw his brother hold a gun and did not know if his brother would hold a gun in his left or right hand. [66]

57. In order to prevail on an ineffective assistance of counsel claim, Defendant must show that counsel performed at a level "below an objective standard of reasonableness." *Strickland* cautions that trial counsel's performance should be reviewed from the defense counsel's perspective at the time decisions are being made. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight. Second guessing or "Monday morning quarterbacking" should be avoided.[67]

58. Evaluating trial counsel's performance from counsel's perspective at the time decisions were being made, it is clear that trial counsel was aware that Defendant suffered gunshot wounds 10 weeks prior to the incident at issue, but he was not advised, nor was he aware through his interactions with Defendant, that Defendant sustained any physical impairment resulting therefrom that would have affected his ability to commit the robbery on the day at issue.

59. The medical records establish that Defendant was shot on April 16, 2012, but do not suggest what Defendant's physical ability or inability was on the date of the incident, June 25, 2012, 10 weeks later. Eleven days after the incident, on July 6, 2012, at the time of his arrest, Defendant was evaluated by the prison infirmary and determined to be physically able to be placed in general prison population. Moreover, there is no

---

[65] Affidavit of Timothy J. Weiler, Superior Court Docket No. 49, Exhibit I.
[66] January 30, 2013 Trial Transcript, at pgs. 136-139.
[67] *Strickland,* 466 U.S. at 688-689.

indication in the medical records that Defendant's physical condition required any daily assistance from any caretaker or aide while in prison for any physical condition.

60. Defendant provided counsel with three possible alibi witnesses: Gia Mayo, Jermaine Clark, and Sharnagia Watson. Defendant's trial counsel, with the assistance of a special investigator, attempted to locate these witnesses and secure their appearance for trial. The special investigator called Gia Mayo and Sharnagia Watson at their last known telephone numbers. A number of attempts were made to secure Gia Mayo's assistance but on each occasion she refused to be of assistance. Sharnagia Watson could not be located. Calls were made to her last known telephone number. Family members were approached to assist in locating her. The special investigator went to the address where Defendant told counsel he was residing and requests were made to the family member at that residence to assist in locating the witnesses. Defendant was keep appraised of counsel's inability to locate his alibi witnesses. Defendant directed counsel to contact to his father to assist in locating his witnesses. Requests were made to Defendant's father to assist in locating Defendant's alibi witnesses. Requests were again made at the time of trial to the Defendant's father as well as other family members that were in the courtroom during the trial. In fact, Defendant's father, who was in the courtroom during the entire trial, contacted Defendant's brother and told his brother to come to trial to testify.

61. In short, Gia Mayo refused to assist the defense. Jermaine Clark, Defendant's brother, was located and testified at trial. Defendant's sister, Sharnagia Watson, could not be located.

62. If Sharnagia Watson, Defendant's sister, was as actively involved in Defendant's care as her Affidavit appears to suggest, it is curious that Defendant's family members,

15

who were at trial, would not have assisted in securing her appearance at trial. Defendant's father and other family members were at Defendant's trial and trial counsel requested their assistance in helping to locate Jermaine Clark and Sharnagia Watson. Trial counsel even reserved the right to call these witnesses at trial, in the hopes that counsel was somehow able to secure their appearance. Yet, although Defendant's father contacted Jermaine Clark and told him to come to trial on his brother's behalf, no family member assisted in securing the appearance of Sharnagia Watson, Defendant's sister, either before trial or during trial.

63. It is hard to believe that Ms. Watson, if she was so involved in Defendant's care, and given her knowledge of his arrest, would not have spoken to her brother or any other family member present at the trial, and would not have known about her brother's trial date, and would not have made the effort to reach out to her brother, or to his counsel, to assist with her brother's defense. This is especially so given the fact that Defendant's family members, including his father, were present at trial, and trial counsel asked those family members to reach out and assist him in having Defendant's alibi witnesses come to court to testify at trial.

64. The standard to be employed is whether trial counsel's investigation was objectively reasonable judging defense counsel's conduct at the time the decisions were being made. Every effort should be made to eliminate the distorting effects of hindsight. Second guessing or Monday morning quarterbacking should be avoided. Defendant's trial counsel made reasonable efforts to locate and contact the "alibi" witnesses provided by Defendant. Two witnesses did not pan out, one, Gia Mayo would not be of any assistance, and the other Jermaine Watson, could not provide an alibi defense, because he

16

was not with his brother on the date of the incident. The third witness, Sharnagia Watson could not be located. Defendant's trial counsel's representation was not objectively unreasonable and Defendant's ineffective assistance of counsel claim must fail. Defendant's trial counsel did not "fail to investigate", he did investigate the "alibi" witnesses provided by Defendant and did attempt to secure their appearance at trial. His efforts to locate Sharnagia Watson were reasonable.

65.     It is important to emphasize that Rule 61 counsel also made an effort to secure Defendant's three alibi witnesses. Rule 61 counsel also retained an investigator and Rule 61 counsel spent months attempting to track down and interview witnesses to support Defendant's defense that he was physically unable to commit the robbery at issue.[68] Rule 61 counsel, unlike trial counsel, did not have any other pressing issues attendant with this case. Unlike trial counsel, Rule 61 counsel did not have any other pre-trial, trial preparation or trial considerations. Unlike trial counsel, Rule 61 counsel were able to focus all their efforts on locating Defendant's alibi witnesses in support of his claim raised herein. There were no other outstanding considerations that also needed attention. Unlike trial counsel, Rule 61 counsel did not have to focus any attention on plea negotiations, evaluating the State's witnesses and preparing cross-examinations, researching legal issues, considering voir dire questions, preparing proposed jury instructions, preparing an opening statement, considering a closing argument, nor did Rule 61 counsel have to be concerned about the plethora of other issues attendant with the preparation and defense of a criminal jury trial.

66.     Despite all of Rule 61 counsels' efforts, of which the focus was only on this one issue, their investigation yielded only one witness- Sharnagia Watson. Rule 61 counsel

---

[68] See, Rule 61 counsels' letter to the court dated December 22, 2014, Superior Court Docket No. 42.

spent months on their investigation. Given the lack of any Affidavit from Gia Mayo and/or Jermaine Clark on this issue, it is clear that both of them were unable or unwilling to provide any assistance on this issue. Given the fact that Rule 61 counsel spent months tracking down and interviewing "witnesses"[69] and their extensive investigation yielded only one witness, it is clear that they were unable to locate anybody else to assist Defendant on this issue.

67.     The law requires that trial counsel perform a reasonable investigation. It does not require that counsel employ Herculean efforts to locate any conceivable witness that may have a bearing on the case. Here, trial counsel's investigation was reasonable.

68.     Rule 61 counsels' months of effort yielded Sharnagia Watson, Defendant's then 17 year old sister. In her Affidavit, Ms. Watson contends that she assisted Gia Mayo in Defendant's "fulltime care." She claims that "Jermaine could hardly walk and care for himself and could not possibly have struggled with someone or ran away from the incident."[70]

69.     Sharnagia Watson was not with the Defendant at the time of the incident. It is therefore unclear the extent to which Ms. Watson would be of assistance to the defense at trial. The victim testified that Defendant "walked up the street, ran up the street, like a little jog up the street." The victim and eyewitness testified about a "struggle" over the gun. Since Ms. Watson was not with Defendant at the time of the incident, the value of her proposed testimony would have to be assessed by trial counsel. The specifics of the "struggle", what it entailed would have to be explored as would the details of whether the

---

[69] See, Rule 61 counsels' letter to the court dated December 22, 2014, Superior Court Docket No. 42, wherein they request a two month extension for the filing of their amended Rule 61 motion so that their investigator can continue to locate "witnesses" since their investigator was still in the process of tracking down and interviewing "witnesses."

[70] Superior Court Docket No. 47-Appendix to Defendant's Amended Rule 61 Motion, at pgs. A243-244.

18

assailant walked, did a "little jog" or ran. Defendant's trial counsel would have certainly wanted to interview Ms. Watson, assess her credibility, and the nature and extent of her testimony.

70. Defendant's trial counsel would have had to weigh the competing considerations of introducing Defendant's gunshot wounds into trial and the strength or weakness of Ms. Watson's testimony would have factored into that analysis. Perhaps Defendant having suffered gunshot wounds ten weeks prior to the incident at issue would have benefited the defense; perhaps it would have negatively impacted the defense. Defendant's trial counsel would have had to consider whether cross-examination of Defendant's brother, Jermaine Clark, on this issue would negate any benefit that may be derived from Ms. Watson's testimony.

71. Moreover, Defendant represented to trial counsel that he was living at 226 North Clayton Street at the time of the incident and that if released from prison he would be returning to that address. Ms. Watson's Affidavit provided in support of Defendant's Rule 61 motion is inconsistent with Defendant's representation in that regard. Ms. Watson claims that both she and Defendant were residing at 408 North Broom Street, and that she along with Gia Mayo were caring for Defendant on a "fulltime" basis. Yet, 11 days later, Defendant was arrested, evaluated by the prison infirmary, and cleared for placement in the general population. The medical records do not reflect that Defendant needed any aide or caretaker on a daily basis while incarcerated. Similarly, Defendant's brother, Jermaine Clark, who was with Defendant 11 days later, cannot support this physical inability theory or else he would have said so- either to trial counsel or to Rule 61 counsel.

19

72.     The fact of the matter remains that despite trial counsel's reasonable efforts, he was unable to locate Ms. Watson. Trial counsel used reasonable efforts to locate Gia Mayo, Jermaine Clark, and Sharnagia Watson. Gia Mayo refused to be of assistance. Jermaine Clark came to court and testified at his father's request but was not able to provide an alibi defense and was not then, or now, able to provide exculpatory evidence as to Defendant's alleged physical inability to have performed the robbery at issue. Sharnagia Watson could not be located despite trial counsel's, and his special investigator's, reasonable efforts to do so.

73.     Defendant failed to establish that trial counsel's conduct was deficient. Defendant's ineffective assistance of counsel claim is undermined by the record and fails to satisfy *Strickland.* The conduct of defense counsel does not appear to be deficient in any regard.


        For all of the foregoing reasons, Defendant's Motion for Postconviction Relief should be denied.



        **IT IS SO RECOMMENDED.**



                                        _____/s/_____
                                        Commissioner Lynne M. Parker



oc:     Prothonotary
cc:     Timothy J. Weiler, Esquire


20